712 S.E.2d 416

Laura CABINESS, John Langley, Robin Bellah, Mary Mason and The City of Charleston, a Municipal Corporation, Appellants,

v.

TOWN OF JAMES ISLAND, Mary Clark as Mayor, and the James Island Alliance for Self Government, Respondents.

No. 26989.

Supreme Court of South Carolina.

Heard Feb. 2, 2011.
Decided June 20, 2011.
Rehearing Denied July 21, 2011.

178

Adelaide S. Andrews and Susan J. Herdina, of Charleston, Charlton DeSaussure, Jr., of Haynsworth Sinkler Boyd, P.A., of Charleston, Frances I. Cantwell, of Regan & Cantwell, of Charleston, and Timothy A. Domin, of Clawson & Staubes, LLC, of Charleston, for Appellants.

Bonum S. Wilson, IV, of Wilson and Heyward, LLC, of James Island, and Trent M. Kernodle and David A. Root, of Kernodle, Root & Coleman, of James Island, for Respondents.

Attorney General Alan Wilson and Assistant Deputy Attorney General J. Emory Smith, Jr., of Columbia, Office of the Attorney General, for Amicus Curiae.

Justice HEARN.

This appeal is the culmination of the Town of James Island's (Town) third attempt to incorporate into its own municipal body. The two previous attempts were invalidated by this Court in *Glaze v. Grooms*, 324 S.C. 249, 478 S.E.2d 841 (1996), and *Kizer v. Clark*, 360 S.C. 86, 600 S.E.2d 529 (2004). While our opinion today does not make the third time the proverbial charm for Town because we find its incorporation petition was not sufficient, we reach the other issues presented in this case in the interest of judicial economy to supply a sufficient framework for Town and other unincorporated areas to successfully petition for incorporation in the future.

## FACTUAL/PROCEDURAL BACKGROUND

Town is located on an island just to the south of peninsular Charleston, South Carolina, with approximately 20,000 inhabitants. Over the years, the City of Charleston and the City of Folly Beach have annexed various portions of James Island, all done legally under the annexation statutes, resulting in various "pods" and "enclaves" of incorporated areas on the island. While Town does not now challenge the validity of these annexations, Charleston's ever-growing presence on the island was the impetus for Town's incorporation movement.

In *Glaze*, we invalidated Town's first attempt at incorporation on the ground that the boundaries of the proposed town were not contiguous. 324 S.C. at 254, 478 S.E.2d at 844. Because there was no statutory definition of contiguity in effect at the time, we supplied our own and found Town could not satisfy it. Specifically, we declined to permit Town to use waterways already annexed by Charleston and Folly Beach to establish contiguity between areas it sought to incorporate. *Id.* at 253–54, 478 S.E.2d at 844. In response to the definition of contiguity we announced in *Glaze*, the General Assembly amended the incorporation statutes to include the following provision:

> Contiguity is not destroyed by an intervening marshland located in the tidal flow or an intervening publicly-owned waterway, whether or not the marshland located in the tidal flow or the publicly-owned waterway has been previously incorporated or annexed by another municipality. The incorporation of a marshland located in the tidal flow or a publicly-owned waterway does not preclude the marshland located in the tidal flow or the publicly-owned waterway from subsequently being used by any other municipality to established contiguity for purposes of an incorporation if the distance from the highland to highland of the area being incorporated is not greater than three-fourths of a mile.

S.C.Code Ann. § 5–1–30(A)(4) (2000). Town accordingly sought to incorporate again using this revised definition of contiguity. However, in *Kizer* we found this new definition was unconstitutional special legislation because it singled out incorporated areas seeking to use tidal marshes and waterways in conjunction with incorporation, and not freshwater

marshes, parks, or highways, without a rational reason for doing so. 360 S.C. at 95, 600 S.E.2d at 533–34.

Following our decision in *Kizer*, the General Assembly again amended the incorporation statutes, this time through 2005 Act No. 77 (Act 77), to address the problems identified by this Court. The requirement for contiguity now reads: " 'Contiguous' means adjacent properties that share a continuous border. If a publicly-owned property intervenes between the two areas proposed to be incorporated together, which but for the intervening publicly-owned property would be adjacent and share a continuous border, the intervening publicly-owned property does not destroy contiguity." S.C.Code Ann. § 5–1–30(A)(4) (Supp.2010). Publicly-owned property is "any federally-owned, state-owned, or county-owned land or water area." *Id.* § 5–1–20(2).

With this new, broader definition of contiguity, Town again sought incorporation. It is this attempt at incorporation that is currently before the Court. The description of the proposed area to be incorporated contained in Town's Petition for Incorporation (Petition) submitted to the Secretary of State's (Secretary) office described Town's boundaries as the physical space commonly thought of as the island of James Island but

specifically excluding all property legally annexed into Folly Beach and Charleston, [and] specifically excluding those properties for which contiguity is not established pursuant to § 5–1–30( [A] )(4), as represented and listed by [Tax Map Sequence (TMS) ] numbers contained in Exhibit A, attached hereto by reference and made a part thereof.

The Petition contained a map identifying the properties to be included within Town's corporate limits. The list of TMS numbers attached to the Petition [1] contained the following disclaimer:

The attached list of TMS Numbers identifies properties to be included in the proposed Town boundaries. Because this list was obtained from Charleston [C]ounty, it contains TMS

---

1. This list was not found in "Exhibit A," the exhibit referenced in the description of the boundaries. The document titled Exhibit A to the Petition was a Certification of Population Density. This list of TMS numbers was identified as part of Attachment 1 to Exhibit H, a feasibility study.

Numbers which are not intended to be included; thus, TMS numbers for properties not to be included have been struck through or underscored by hand. [D]o not include those properties struck through or underscored in defining the proposed town's boundaries.

This list of TMS numbers came from various sources, including Charleston County, Charleston, and Folly Beach. However, none of the over 9,200 TMS numbers included in that list were struck through or underscored. Additionally, the list and the proposed map of Town's boundaries had some inconsistencies: 144 properties on the TMS list were not marked on the map as being included in Town, and 117 properties identified on the map were not found in the TMS list. Furthermore, Charleston annexed 121 properties located on either the list or the map after Town filed its Petition and 116 during the time prior to Town's filing of the Petition but while it was organizing to do so. 'Due to the fluctuating state of the incorporated areas of James Island, Town re-checked and updated its data throughout the Petition process in an attempt to stay current.

After receiving the Petition, the Secretary's office forwarded Town's Petition to the Joint Legislative Committee on Municipal Incorporation (Committee). The Committee found the Petition sufficient and recommended that the Secretary certify a local special election to determine whether the incorporation should take place. On the eve of the election, Town sent an email to the Charleston County Board of Elections, which was organizing the special election, striking some twenty-four properties from the election roll because they were not contiguous.[2] Town did not inform the Secretary's office of this deletion. The voters were in favor of incorporation by a margin of three-to-one, and the Secretary's office issued a Certificate of Incorporation to Town. Appellants subsequently challenged the election in the circuit court in a timely manner.

---

2. Appellants claim to not know why Town asked these properties be stricken from the roll. However, the circuit court specifically found these properties were not contiguous to the main body of the proposed town. Because Appellants have not challenged that finding on appeal, it is the law of the case. *See Johnson v. Hunter*, 386 S.C. 452, 455, 688 S.E.2d 593, 595 (Ct.App.2010). Accordingly, for purposes of this appeal these properties are not, nor were they ever, part of the area to be incorporated.

Before the circuit court, Appellants first alleged that the most recent amendments to the incorporation statutes effected by Act 77 were unconstitutional special legislation. Additionally, Appellants argued that Town's Petition was insufficient and sought to incorporate property that is not contiguous. The court found for Town on all of Appellants' issues. This appeal followed.

## ISSUES PRESENTED

I. Does Town's Petition satisfy the requirements of Section 5–1–24 of the South Carolina Code (Supp.2010)?

II. Are the incorporation statutes concerning contiguity and publicly-owned property unconstitutional special legislation?

III. Does the definition of contiguity supplied by section 5–1–30(A)(4) permit an area seeking to incorporate to use publicly-owned property already incorporated or annexed into an existing municipality to affirmatively establish contiguity?

## LAW/ANALYSIS

### I. Sufficiency of Petition

Appellants argue Town's Petition failed to comply with the requirements of section 5–1–24. We agree.

Section 5–1–24 lays out the content requirements for a petition for incorporation. It requires that the petition set out the corporate limits for the proposed municipality and the number of inhabitants residing therein. S.C.Code Ann. § 5–1–24(A)(1). The petition must then be signed by fifteen percent of the qualified electors who reside within those limits. *Id.* Finally, the petition must contain documentation concerning the minimum service standards set out in section 5–1–30. *Id.* § 5–1–24(A)(2). Appellants only challenge Town's compliance with the first requirement, arguing that Town did not set forth its proposed limits with sufficient specificity.

In its Petition, Town described the general metes and bounds of the island of James Island and then specifically excluded all property annexed by either Folly Beach or Charleston and property that is not contiguous under section

5-1-30(A)(4). Appellants point out that properties on the map and the TMS list included with the Petition were not identical, each containing properties not listed on the other as being included within Town's boundaries; the boundaries of Town are subject to change due to challenges regarding the contiguity of Town's limits, as well as Charleston's continuing annexations; and twenty-four properties were stricken from the voter rolls on the eve of the election. Appellants therefore argue the Petition submitted by Town was incomplete, contained inaccuracies and inconsistencies, and was conditional upon the resolution of certain issues and Charleston's actions. Accordingly, they believe it is void because it was not sufficiently clear to enable the Secretary and the Committee to determine the proposed limits of Town. The circuit court disagreed, finding that Town substantially complied with the requirements of section 5-1-24.

 Because this section is a recent addition to South Carolina's code, the appellate courts of this State have not yet had an opportunity to address the requirements under it. However, other jurisdictions have squarely faced this issue with similar statutes. In *People ex rel. Village of Worth v. Ihde,* 23 Ill.2d 63, 177 N.E.2d 313 (1961), the Supreme Court of Illinois held that "[d]escriptions of municipal boundaries are not construed with the same strictness as those contained in deeds and contracts[,] and if the incorporating petition and accompanying map, when viewed together, fairly apprise the public of the property involved, the description will be considered proper." *Id.* at 315. So long as the variance in the descriptions is not so great "as to cause public misapprehension upon the point," the petition is valid. *Id.* In Wisconsin, "if the description and the map, when viewed together, fairly apprise the public of the territory to be incorporated, the statute will be satisfied notwithstanding certain errors or omissions." *In re Incorporation of Town of Port Washington as a Village,* 248 Wis.2d 893, 637 N.W.2d 442, 446 (Wis.Ct. App.2001).

 We find the rules enunciated in *Village of Worth* and *Town of Washington* to be fair statements of the requirement under section 5-1-24. The language of section 5-1-24 does not require strict construction of incorporation petitions, nor

would such a requirement be reasonable. During the time it takes to incorporate a municipality, many different eventualities may occur that are out of the incorporating body's control. Annexation into an existing municipality is a prime example. During the pendency of a petition for incorporation, an existing municipality can validly annex properties that are within the proposed limits of the new entity. Such an act is perfectly lawful, and we do not wish to punish areas seeking to incorporate by holding their petitions invalid because the precise limits are in a state of flux due to continuing annexations. Penalizing the municipality for these actions would be inconsistent with the goal of allowing and encouraging local areas to attain self-governance by permitting an adjoining area to thwart these noble efforts. Furthermore, when areas comprised of thousands of separate properties seek to join together into a unified municipality, requiring one-hundred percent accuracy for the boundary description may be practically impossible. County and local tax maps may not be in sync, and there are often discrepancies between which properties lie in unincorporated areas and which have already been incorporated or annexed. Again, we cannot hold the expectant municipality accountable for such errors. Accordingly, a petition will sufficiently describe the boundaries of the proposed municipality so long as it fairly apprises the public of what is to be included, even if there are some errors or inconsistencies.

However, we do not believe Town has met this requirement. The problem lies not with the continuing annexations performed by Charleston, nor with the discrepancies between the map and the TMS list, which only account for a relatively small number of the total properties sought to be incorporated.[3] There is also no deficiency in excluding all areas already incorporated into Folly Beach and Charleston, as most people would know whether their property is within the unincorporated part of James Island or either of those cities. Additionally, Town did not err in striking properties from the election roll

---

3. Town argues that because TMS numbers are not required by the statute to be included in a petition for incorporation, their inaccuracy in this case does not affect its incorporation. However, because Town specifically referenced and included these TMS numbers in the Petition, we cannot disregard them.

on the eve of the election as these properties were not contiguous with Town and therefore not part of it to begin with. The total effect of all those issues is, at most, *de minimis,* and the result of the realities of the incorporation process.

██ Instead, the flaw in Town's Petition emanates solely from the language simply excluding all properties that are not contiguous under section 5-1-30(A)(4). As the parties made clear through the various exhibits used during the trial, our final interpretation of contiguity has the potential to affect the inclusion of well over one thousand properties, which cannot be considered to be *de minimis.* We recognize that the reason why contiguity is an issue in this case is the piecemeal annexation of properties on James Island by Charleston before, during, and after the filing of the Petition. While the mere fact that Charleston was annexing properties during this time does not by itself impact the sufficiency of Town's Petition, we must draw the line where those actions potentially impact the inclusion of large portions of the properties sought to be incorporated by cutting off sizeable areas from the main body of Town. When this happens, we are no longer faced with "certain errors or omissions" or a fair notification of what is to be included. Instead, we are confronted with a situation where the inclusion of a significant number of properties is contingent upon a *post hoc* judicial determination, which leaves the voters unaware of whether large portions of Town will ever be incorporated at the time they cast their votes. In the case before us, this causes sufficient uncertainty over what the public believes is included within Town such that they could not be fairly apprised of the property involved.

We recognize that this places Town in the unenviable position of attempting to define an area it seeks to include without much guidance from the applicable statutes or case law and with much disagreement as to what properly can be included. However, Town took no preliminary steps to determine what it may be able to incorporate despite knowing of this contingency. This created a major risk that Town may be seeking to exclude a large number of non-contiguous properties by merely excluding a broad and vague category of properties in the Petition. It is the uncertainty generated by this risk that renders the Petition insufficient. As best as we can tell, this

risk is fairly unique due to Town's relationship with Charleston, but it is still a substantial risk nonetheless. Despite the inclusion of a map and list of TMS numbers [4] to illustrate what Town was attempting to incorporate, the uncertainty surrounding the inclusion of large tracts of property within Town's proposed limits renders the Petition insufficient.[5] Accordingly, we reverse the judgment of the circuit court. We realize our conclusion that Town's Petition was not sufficient is dispositive of this case. However, in the interest of judicial economy and the likely event of Town re-filing its Petition, we reach the remaining issues to provide guidance for future incorporation petitions and help alleviate the ambiguities that plagued Town's most recent petition.

## II. Constitutionality of Contiguity Provisions

Next, we consider the question of whether the contiguity provisions enacted through Act 77 are unconstitutional special legislation. Appellants contend the 2005 amendments are unconstitutional because they treat those annexing into an existing municipality differently than those seeking to incorporate separately. In particular, they allege persons seeking to incorporate can cross over and "disregard" existing municipal boundaries to establish contiguity, while the same is not permitted for property owners attempting to annex. In response, Town argues those incorporating and those annexing are not part of the same class, therefore the amendments do not result in disparate treatment among class members, which is the hallmark of special legislation. We agree with Town and hold the statute constitutional.

---

4. Although Town's Petition did include a list of TMS numbers for properties it said were *included* within its boundaries, the list contained a notation that properties it did not seek to include had been struck through or underscored. Because none of the numbers were marked out, we do not believe the public could fairly rely on this list to determine what was to be included in Town.

5. We do not hold that any uncertainty or the threat of any legal challenge to the precise boundaries of a proposed town will render the incorporation petition insufficient. Rather, it is in a case such as this where the inclusion of sizeable portions of the municipality is at stake that the sufficiency of the petition come into question.

▮ Our Constitution provides, "The General Assembly of this State shall not enact local or special laws concerning any of the following subjects or for any of the following purposes, to wit: ... To incorporate cities, towns or villages, or change, amend, or extend charter thereof." S.C. Const. art III, § 34, cl. II. When a statute is challenged on the ground that it is special legislation, the first step is to identify the class of persons to whom the legislation applies. *Kizer*, 360 S.C. at 92–93, 600 S.E.2d at 532. In this regard, our special legislation framework largely tracts that for determining whether a statute violates one's right to equal protection. *Id.* at 93, 600 S.E.2d at 533. If the statute treats all class members equally, then the law is general legislation and permissible. *Id.* at 92–93, 600 S.E.2d at 532. The law must be general both in form and in operation. *Id.* at 93, 600 S.E.2d at 532.

▮ If the legislation does not apply uniformly, the second step is to determine the basis for that classification. *Id.* It is well-settled that the mere fact a statute creates a classification does not render it unconstitutional special legislation. *Id.* Rather, it is only arbitrary classifications with no reasonable hypothesis to support them that are prohibited. *Id.* at 93, 600 S.E.2d at 533. Again, this parallels our analysis under the rational basis test for equal protection challenges. A classification is constitutional "if some intrinsic reason exists why the law should operate upon some and not upon all, or should affect some differently than others," or the special law "best meet[s] the exigencies of a particular situation." *Id.* Put another way, "[t]he classification must bear some reasonable relation to the object sought to be obtained by the law." *U.S. Fid. & Guar. Co. v. City of Columbia*, 252 S.C. 55, 61, 165 S.E.2d 272, 274 (1969). As always, statutes are presumed constitutional, and the party challenging them must prove their infirmity beyond a reasonable doubt. *McElveen v. Stokes*, 240 S.C. 1, 6, 124 S.E.2d 592, 594 (1962). "We will not overrule the [General Assembly]'s judgment that a special law is necessary unless there has been a clear and palpable abuse of legislative discretion." *Kizer*, 360 S.C. at 93, 600 S.E.2d at 533.

▮ Turning to the case before us, we must first determine the proper class to which Act 77 applies. Appellants

argue the class created is the broader group of all those seeking to effect changes in municipal boundaries, be it through incorporation or annexation. Town argues, and we agree, that the class is comprised solely of people seeking to incorporate; those attempting to annex are in a separate class unto themselves. First, the statute by its very terms applies only to those incorporating; the provisions for annexation are found in another chapter of the code. Second, there are myriad differences between incorporation and annexation such that those attempting to accomplish either are not similarly situated. *Compare* S.C.Code Ann. § 5–1–10 *et seq.* (incorporation statutes) *with* S.C.Code Ann. § 5–3–10 *et seq.* (annexation statutes).[6] Therefore, those incorporating and those annexing are dissimilar enough that they are not in the same class for purposes of our special legislation analysis. Because the contiguity statute treats all members of the class of incorporators similarly on its face, it is general legislation in form.

■■■ Further, we find no evidence that Act 77 in practice affects only a certain number of individuals seeking to incorporate, which was the first constitutional defect identified in *Kizer*. Although the contiguity statute in effect at that time in *Kizer* applied generally on its face, we determined that in reality it applied only to "any unincorporated area that is *geographically configured so that it may establish contiguity using previously annexed marshland and waterways.*" *Kizer*, 360 S.C. at 94, 600 S.E.2d at 533 (emphasis added). The legislation therefore implicitly created two different groups of incorporators: those using previously annexed marshland and waterways and those seeking to use other previously annexed property. *Id.* at 95, 600 S.E.2d at 534. Because of this disparity, we proceeded to determine whether the classification was arbitrary and unreasonable. *Id.* at 94, 600 S.E.2d at 533. Here, the statute is not so limited. In *Kizer*, we were troubled that only areas situated next to tidal marshlands and waterways could take advantage of provisions of the statute,

6. Although these differences are rooted in statute, Appellants do not argue they represent disparate treatment between incorporation and annexation. Rather, these provisions demonstrate the fundamental differences between property owners attempting to annex into an existing municipality versus those seeking to incorporate separately.

which amounted to a very small number of unincorporated areas in the State. *Id.* Although a class comprised of one member certainly can be constitutional, *id.* at 93, 600 S.E.2d at 532, we found the statute created two distinct groups within the class of incorporators, *id.* at 94, 600 S.E.2d at 533. The version of the statute now before the Court addressed that concern by permitting the use of *any* publicly-owned property, regardless of where it exists in the State. While an area seeking to incorporate only benefits from the current version of section 5–1–30(A)(4) if there is publicly-owned property available for use in the manner prescribed, the current language does not present the same geographically targeted approach as that at issue in *Kizer*. In fact, Appellants appear to concede that Act 77 creates no true subclasses within the broader class of incorporators. Therefore, Appellants have not proven beyond a reasonable doubt that Act 77 implicitly creates two groups of incorporators, and we find it is general in operation. We accordingly hold that the amendments contained in Act 77 are constitutional.

 Because we hold that the statute in question is general legislation as it creates no disparate treatment within the applicable class, we need not reach the second question in our special legislation analysis of whether any subclass created is reasonable. Contrary to Appellants' argument that "the legal underpinning of any law is its rationality, regardless of its general application or whether it creates a class," a law cannot be unconstitutional special legislation unless it is first, indeed, special. Were we to examine the rationality of a law irrespective of any classification it creates, we would impermissibly step from our position as the arbiter of a statute's constitutionality and into the seats of the General Assembly. The mere fact that a law may be irrational does not automatically make it unconstitutional. Such arguments must be made at the ballot box, not to the bench.

### III. Definition of Contiguity

The resolution of the challenge regarding the definition of contiguity revolves around two issues: (1) whether ownership of property for purposes of section 5–1–20(2) requires fee simple ownership or embraces other possessory interests such as easements and right of ways and (2) whether an area

seeking to incorporate can use publicly-owned property to affirmatively establish and create contiguity with another area. Town argues that a strict interpretation of the definition of ownership contravenes the express intent of the General Assembly, and we agree. As to precise application of contiguity, Appellants urge us to focus on the words "but for" contained in the statute and argue for a stricter interpretation of contiguity. Town, on the other hand, argues for a broader view of contiguity, in essence arguing that so long as unincorporated areas can be connected by publicly-owned property—even if that includes "running down" public roads to do so—the incorporating area has met the contiguity requirement.[7] As to this issue, we agree with Appellants.

The cardinal rule of statutory construction is that the intent of the legislature must prevail if it reasonably can be discerned from the words used in the statute. *Eagle Container Co. v. County of Newberry*, 379 S.C. 564, 571, 666 S.E.2d 892, 895 (2008). These words must be construed in context and in light of the intended purpose of the statute in a manner "which harmonizes with its subject matter and accords with its general purpose." *Id.* at 570, 666 S.E.2d at 896. The meaning of certain words can be ascertained by reference to associated words in the statute. *Id.* However, if the language is plain and unambiguous, we must enforce the plain and clear meaning of the words used. *Id.* But if applying the plain language would lead to an absurd result, we will interpret the words in such a way as to escape the absurdity. *Ventures S.C., LLC v. S.C. Dep't of Revenue*, 378 S.C. 5, 9, 661 S.E.2d 339, 341 (2008). A merely conjectural absurdity is not enough; the result must be "so patently absurd that it is clear that the [General Assembly] could not have intended such a result." *Harris v. Anderson County Sheriff's Office*, 381 S.C. 357, 363 n. 1, 673 S.E.2d 423, 426 n. 1 (2009).

The current version of the incorporation statutes generally states that areas seeking to incorporate must be contiguous, meaning they are adjacent and share a continuous border.

---

7. In instances where Town seeks to incorporate publicly-owned property, this problem does not arise. There, the publicly-owned property is to be part of Town and there is no issue of it "destroying" contiguity. This issue only arises where publicly-owned property *already annexed* by Charleston intervenes between areas Town seeks to incorporate.

S.C.Code Ann. § 5–1–30(A)(4). However, if publicly-owned property intervenes between two areas sought to be incorporated together as one, which but for that property would be contiguous, then they are still considered contiguous for incorporation purposes. *Id.* In other words, contiguity is not "destroyed" by that publicly-owned property. *Id.* Publicly-owned property is any federally-owned, state-owned, or county-owned land or water. *Id.* § 5–1–20(2). Publicly-owned property will not destroy contiguity even if it already has been annexed by an existing municipality. *Id.* § 5–1–24(A)(2).

In addition to the plain language of these particular provisions, the General Assembly included various policy statements in the code and in Act 77 regarding incorporation. Section 5–1–22 of the South Carolina Code (Supp.2010) reads,

The General Assembly finds and declares the following to be the public policy of the State of South Carolina:

(1) publicly-owned property may be incorporated or annexed by a municipality as provided by the state's statutory law; however, publicly-owned property is for the benefit of all citizens of the State and is not the exclusive territory of any one municipality; and

(2) incorporation or annexation of publicly-owned property does not confer or convey to a municipality control over the publicly-owned property that in any way:

(a) interferes with the superior authority of the federal, state, or county government; or

(b) prevents an area seeking to be incorporated from using the publicly-owned property to establish contiguity as provided in Section 5–1–30(A)(4).

The preamble to Act 77 contains similar language:

Whereas, municipal boundaries are limited only by the state's statutory law requirements; and

Whereas, some municipalities already extend across county lines; and

Whereas, if a publicly-owned property, such as a road or waterway, is within the exclusive territory of a single municipality, that municipality could extend its boundaries across the State, preventing areas that otherwise meet the statuto-

ry requirements for municipal incorporation from attaining local self-governance; and

Whereas, the General Assembly finds and declares that publicly-owned property is for the benefit of all citizens of the State and not to be used as the exclusive territory of any one municipality.

We do not read the word "owned" as being limited to only fee simple ownership. When federal, state, county, or local governments have an interest in a road, there is little else the fee simple owner can do with that property. Not only does the evidence before us show that these bodies hold their interests in perpetuity, but should the fee simple owner object to the government's use, the government could simply condemn the property and take title in fee simple. In these instances, there is little, if anything, the private owner could do to the detriment of the rights he or his predecessor granted to the public body. For all intents and purposes, the government therefore is the owner of the property for purposes of incorporation. As evidence of the absurdity created by Appellants' position, Town points out that one of the roads in question in this case has two owners: the inner two lanes of it are privately owned with the state holding a right of way, while the state owns the outer two lanes in fee simple. Declaring only one-half of the road to be publicly-owned property, while the general populace has an equal right to use the entirety of it regardless of which lane they happen to be traveling in, cannot be the result intended by the General Assembly. Such a result would be contrary to the General Assembly's express intent of fostering incorporation by not permitting public roads and waterways to destroy the required contiguity. The thrust of property being publicly-owned is that it be for the benefit of the public, which is not dictated solely by who owns the underlying earth.

However, we disagree with Town and the circuit court as to the ultimate application of the principle of contiguity. We agree with Appellants that the "but for" language used in section 5–1–30(A)(4) means that if the publicly-owned property simply were to be removed, the question is whether the properties then share a continuous border.[8] The record com-

_____

8. Under this requirement, if two parcels touch even at just one point, they are contiguous. Appellants argue that in order to be contiguous,

piled by the parties for this appeal contains numerous, well-executed exhibits illustrating this principle. Perhaps the most convincing exhibits illustrated the "but for" concept of contiguity in a "MAD Magazine" style back-page folding manner,[9] where a map of two areas alleged to be contiguous was folded in such a manner as to eliminate the previously-annexed publicly-owned property. As an added illustration, the language of the statute requires taking a zipper and closing up the publicly-owned property so that it does not exist for these purposes. It is only then that one truly can determine if *but for* that publicly-owned property would the areas touch. While the specific property lines and geographic configuration of some areas may make this analysis somewhat difficult, every effort must be made to close up the publicly-owned property in question for purposes of this analysis. Under the analysis accepted by the circuit court and argued by Town, publicly-owned property may not be the only thing between the areas sought to be incorporated, yet the areas would still be contiguous. In numerous instances, for example, once the publicly-owned property was removed from the equation, other properties already annexed by Charleston intervened between what Town seeks to incorporate. In those cases, it is only by traversing the length of the road and around these other properties that one can connect the properties claimed to be contiguous. This affirmative use of publicly-owned property to establish contiguity ignores the plain "but for" language contained therein. Furthermore, it improperly inverts the language that publicly-owned property does not

---

the parcels' boundaries must overlap to some degree, no matter how small. Under their view, if two parcels touch at just one point, they are not contiguous because under principles of geometry, one can pass through a single point only once and cannot return through it again. However correct this argument may be geometrically, it is not in tune with the statutory requirements involved here. Section 5–1–30(A)(4) does not require overlap between the properties; it only requires that they share a continuous border. It was conceded at trial that even when two properties touch at one point, the border they share is continuous.

9. For those not familiar with this reference, we suggest examining the following compilation of MAD Magazine fold-ins from the New York Times: Fold–Ins, Past and Present—Interactive Feature—NYTimes.com, http://www.nytimes.com/interactive/2008/03/28/arts/2008033_FOLD_IN_FEATURE.html# .

destroy contiguity into the proposition that publicly-owned property can affirmatively establish it.

Town argues that this construction of contiguity is contrary to the stated public policy of more freedom in using publicly-owned property for purposes of incorporation. Indeed, we just concluded *supra* that the strict interpretation of the word "owned" contravenes that policy and the intent of the General Assembly. However, the same is not true when applying the plain language of the contiguity definition. The code provides that publicly-owned property is "for the benefit of all citizens of the State and is not the exclusive territory of any one municipality." *Id.* § 5–1–22(1). It also states that no municipality can exercise control over publicly-owned property in any way that prevents it from being used to establish contiguity under section 5–1–30(A)(4). *Id.* § 5–1–22(2)(b) (citing *id.* § 5–1–30(A)(4)). Those provisions, however, do not create an unfettered right inuring to unincorporated areas to use publicly-owned property for incorporation purposes. Instead, they specifically refer to and are controlled by the statute governing contiguity. Nothing in our interpretation of contiguity would enable an existing municipality to prevent an area seeking to incorporate from using publicly-owned property, and nothing places it in the hands of any one municipality. What prevents Town from using certain parcels of publicly-owned property to establish contiguity is not the manner in which Charleston uses it, but the limitations imposed by the statute.

Therefore, while we found strict adherence to the plain language of the definition of publicly-owned property produced results contrary to the express intent of the General Assembly, nothing compels us to do the same here. We must ensure that the absurd results exception to the plain language rule of statutory construction remains an exception and apply it only when the absurdity is clear. *See Harris,* 381 S.C. at 363 n. 1, 673 S.E.2d at 426 n. 1 ("While we may be concerned with the unintended consequences of applying the clear meaning of [the statute] in every conceivable circumstance, such concerns in this case fall short of an absurdity that would warrant applying this rule of statutory construction."). Here, we find no patent violation of the public policy announced by the General Assembly. Accordingly, we adhere to the plain

language of the definition of contiguity and require incorporating areas with issues pertaining to contiguity to conceptually eliminate publicly-owned property from the map of their proposed boundaries and determine if the properties would then touch.[10]

## CONCLUSION

In conclusion, we hold Town's Petition was not sufficient under section 5–1–24, and therefore we reverse the order of the circuit court upholding Town's most recent attempt at incorporation. Accordingly, we remand this matter to the circuit court for entry of judgment in favor of Appellants. However, because of the need for clarity in this area, we reach the remaining issues presented by Appellants. In doing so, we affirm the circuit court's conclusion that the incorporation scheme at issue here is not unconstitutional special legislation. We further affirm the circuit court's holding that the term "publicly-owned property" does not require fee simple ownership by the federal, state, or county governments. However, we reverse the circuit court's analysis of contiguity and hold that it is not proper for an area seeking to incorporate to "run down" the length of a public road to add more properties to the proposed municipality.

TOAL, C.J., BEATTY and KITTREDGE, JJ., concur.

PLEICONES, J., concurring in a separate opinion.

---

**10.** The contiguity provision for annexation contains the same "but for" language as the incorporation statute. *Compare* S.C.Code Ann. § 5–3–150 (annexation) *with* S.C.Code Ann. § 5–1–30(A)(4) (incorporation). The only difference is the annexation statute specifically states the property mentioned—which is not the familiar publicly-owned property—cannot be used to affirmatively establish contiguity. *Id.* § 5–3–150. While the incorporation statute does not have the same express statement that publicly-owned property does not affirmatively create contiguity, the fact both statutes have identical "but for" provisions is certainly probative of the General Assembly's intent that they are to operate in the same way. *See Gov't Employees Ins. Co. v. Draine,* 389 S.C. 586, 596, 698 S.E.2d 866, 871 (Ct.App.2010) (citing *Gustafson v. Alloyd Co.,* 513 U.S. 561, 572–73, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (holding statutory terms should be given the same meaning in different sections absent legislative intent to the contrary)).

Justice PLEICONES:

I concur, but write separately as I believe that the issue of the sufficiency of the petition is dispositive of the appeal. I therefore join only Part I of the majority's decision.